## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )
                               )
              vs.              )      **CR. 08-29**
                               )
HAROLD WOLFORD,                )
                               )
       Defendant               )
                               )

## OPINION

Pending before the Court are Defendant Harold Wolford's "Motion[s] to Suppress

Evidence Obtained as a Result of an Unlawful Search and Seizure with Citation of Authority"

("Defendant's Motion to Suppress") [Doc. ##82 and 105][1]. In his Motion to Suppress, Defendant

"moves for the suppression of all physical evidence obtained from the blue GMC conversion van

stopped by Officers Lukanski and Caterino of the Braddock Police Departments on March 18,

2005, all statements attributed to Wolford and taken by Braddock Police Department Officers on

or about March 18, 2005, and any and all evidence derived therefrom, including evidence derived

from the execution of a search warrant on the blue GMC conversion van on March 18, 2005."

Motion to Suppress, pp. 1-2. A hearing on Defendant's Motion to Suppress was held on

September 20 and 28, 2010. Testifying for the government was Officer James Caterino ("Officer

Caterino") of the Braddock Police Department. Testifying on behalf of the Defendant was

Robert W. Sellmon II ("Mr. Sellmon") and Mr. Wolford himself. For the reasons set forth below,

the Defendant's Motions to Suppress will be granted in part and denied in part.

---

[1]Docs. ##82 and 105 are the same document with the exception that Doc. #105 contains
an exhibit which was omitted from Doc. #82. We have considered the two motions as if they
were one filing.

## I. Factual Background.

After reviewing the documents of record, hearing testimony at the suppression hearing, and determining that the testimony of Officer Caterino was more credible than the testimony of Mr. Sellmon and Mr. Wolford with respect to the events that occurred on March 18, 2005, the Court makes the following findings of fact.

On March 18, 2005, at approximately 5:30 A.M., Officer Caterino and fellow Braddock police officer Michael Lukanski ("Officer Lukanski") were patrolling Braddock in a marked police car. Both officers were in uniform. It was dark.

The police car was on 5th Street when the police officers saw a blue GMC conversion van on Pine Way, a one-way alley that runs behind Talbot Avenue between 5th Street and 6th Street. The van was parked on a parking pad on the left side of the alley. Officer Caterino knew the van was Mr. Wolford's van; he knew who Mr. Wolford was and had seen the defendant in this vehicle numerous times. When the officers first saw the defendant's van, it was stopped, with its running lights on. They could not see who was driving the van.

The van was located behind a house and an apartment building about which the Braddock police had had numerous complaints and arrests related to drug and weapons activity. The Braddock police had arrested individuals in this apartment building for drugs and had been told that they had bought the drugs from Mr. Wolford, who was known as "Fox." So prior to stopping Mr. Wolford, Officer Caterino had prior information that Mr. Wolford was a drug dealer.

Prior to March 18, 2005, Officer Caterino had never seen Mr. Wolford's van parked near the apartment. Officer Caterino did not see Mr. Wolford exit either the apartment or the house on the date in question.

2

Officer Caterino knew Mr. Wolford had a nephew who resided at 529 Talbot Avenue. Mr. Wolford's mother also resides at 529 Talbot Avenue, but Officer Caterino did not know that piece of information.

The police turned right onto Pine Way. They shut the car's lights off and started slowly down Pine Way. As they approached the van's location, the van pulled out.

At the end of the Pine Way, the driver of the van stopped, put on his right turn signal, and turned right onto 6th Street. The officers followed, turned right onto 6th Street and turned their vehicle lights on. Officer Caterino did not think Mr. Wolford could see them when he was driving on 6th Street, but he might have seen them as they entered Pine Way from 5th Street.

As the officers' vehicle reached the intersection of Pine Way and 6th Street, they saw the van speed up and turn right onto Talbot Avenue without stopping at a clearly marked stop sign or using a turn signal.

The officers followed the van onto Talbot Avenue and tried unsuccessfully to perform a traffic stop of the van around 5th Street by turning on their flashing light and siren. The van did not stop. They finally were able to initiate a traffic stop at 4th Street when the van pulled over and parked across the street from Mr. Wolford's house. The traffic stop occurred at approximately 5:38 A.M.; it was still dark outside.

The officers parked the police car directly behind the van and began to run the van's registration to find out the owner. As this was being done, Mr. Wolford exited the vehicle and started to cross the street towards his house, which was in located in a different direction from the police car. He made neither eye nor voice contact with the officers during this time.

3

Upon seeing Mr. Wolford exit the vehicle and start to walk away, Officer Caterino immediately stepped out of the police car and instructed Mr. Wolford to get back into his vehicle. At this point, Mr. Wolford was in the middle of the roadway. Mr. Wolford protested, but complied without resisting, and returned to the van. Mr. Wolford closed the door of the van and lowered the window on the driver's side of the conversion van.

Officer Caterino approached the driver side of the van. He was not tall enough to see into the van; his sight was also obstructed by the defendant, who has a stocky build and was seated in a captain's chair in the van. As Officer Caterino approached the driver's side of the van, Officer Lukanski approached the passenger side of the van

Officer Caterino asked Mr. Wolford for his license, registration card, and proof of insurance. He explained to Mr. Wolford that when the lights and sirens on a police vehicle are activated, he should not leave his vehicle. Officer Caterino told him this for safety reasons. Officer Caterino explained to the Court that requiring an individual who has been stopped to stay in the vehicle is a standard police practice, but it is not the law.

As this conversation was taking place between Officer Caterino and Mr. Wolford, Officer Lukanski walked around the van and told Officer Caterino that he had seen a firearm on floor of the van near where Mr. Wolford was seated.

Officer Caterino then drew his weapon, got Mr. Wolford out of the car at gunpoint, handcuffed him, and put him in back of the police car. Mr. Wolford did not resist. As Officer Caterino was handcuffing Mr. Wolford, he explained to Mr. Wolford that he was not under arrest, but that he was being detained for safety reasons while they found out what was going on.

4

Officer Caterino then asked Mr. Wolford, while he was handcuffed, if he was the registered owner of the firearm. In response to the question, Mr. Wolford said "no, he had bought it off the street." Officer Caterino then placed Mr. Wolford, still handcuffed, in the police car.

While Officer Caterino was placing Mr. Wolford in the police car, Officer Lukanski retrieved the weapon from the van.

Officer Caterino ran the firearm's information. It came back as no record found, which meant that he could not know whether or not the gun was registered to Mr. Wolford. Officer Caterino was then informed by dispatch that Mr. Wolford did not have a permit or license to possess a firearm.

After Mr. Wolford was handcuffed and placed in the police car, Officer Caterino asked Mr. Wolford if he had any other weapons or contraband in the van. Mr. Wolford said "no." Officer Caterino then said "then there is no reason not to let us search your van." Mr. Wolford would not give permission for the search. Instead he told the officers something to the effect of "you're going to do it anyhow, but get a search warrant."

The total time of the stop was approximately ten (10) minutes.

Officer Caterino recalled informing Mr. Wolford of his Miranda rights on way to the police department. The police report, which was authored by Officer Lukanski, indicated that Mr. Wolford was informed of his Miranda rights upon arrival at the police department. Once he was informed of his Miranda rights, Mr. Wolford would not speak with the officers.

Lieutenant Knott of the Braddock Police Department had shown up at the scene of the traffic stop at some point after the stop began. Officer Caterino had Lieutenant Knott stay with Mr. Wolford's van while they got a search warrant.

It took about three hours to get a search warrant for the conversion van. The application

for the search warrant was completed by Officer Lukanski. It stated under the section "Identify

Items to Be Searched For and Seized (Be as specific as possible): "NARCOTICS AND

WEAPONS IN ANY AND ALL LOCATIONS OF A BLUE GMC CONVERSION VAN

BEARING PENNSYLVANIA REGISTRATION ...., BEING REGISTERED TO A: HAROLD

T. WOLFORD...." The application for the search warrant further stated under the section

"Specific description of premises and/or person to be searched": ANY AND ALL LOCATIONS,

BOTH ON THE INTERIOR AND EXTERIOR OF A BLUE GMC CONVERSION VAN

BEARING PENNSYLVANIA REGISTRATION ..... THIS VEHICLE IS REGISTERED TO A:

. . . HAROLD T. WOLFORD...."

The affidavit of probable cause attached to the application for the search warrant also was

completed by Officer Lukanski. It stated:

> ON FRIDAY, MARCH 18, 2005, I OFFICER LUKANSKI ALONG WITH
> OFFICE CATERINO WERE ON PATROL IN THE BOROUGH OF
> BRADDOCK . . . . AT APPROXIMATELY 0538 HOURS, THESE OFFICERS
> WERE TRAVELING EASTBOUND ON PINEWAY AND OBSERVED A
> BLUE GMC CONVERSION VAN BEARING PA REGISTRATION FWW-4833
> PARKED IN THE REAR OF 537 TALBOT AVENUE, WHICH IS KNOW TO
> THESE OFFICERS A HIGH DRUG TRAFFIC AREA. AS OFFICERS
> APPROACHED THE VEHICLE, THE VAN PULLED OUT AND TURNED
> SOUTHBOUND ONTO SIXTH STREET. AS THE VAN APPROACHED A
> CLEARLY MARKED AND POSTED STOP SIGN AT THE INTERSECTION
> OF SIXTH STREET AND TALBOT AVENUE, OFFICERS OBSERVED THE
> VEHICLE TURN ONTO TALBOT AVENUE (WEST BOUND) WITHOUT
> USING A PROPER TURNING SIGNAL OR COMING TO A COMPLETE
> STOP.  OFFICERS INITIATED A TRAFFIC STOP AT THE INTERSECTION
> OF TALBOT AND FOURTH STREET, USING VISUAL LIGHTS AND
> AUDIBLE SIRENS.
>
> WHILE OFFICER LUKANSKI WHILE CALLING IN THE VEHICLE
> INFORMATION TO DISPATCH, THE DRIVER EXITED THE VEHICLE AND

BEGAN TO WALK AWAY FROM THE VAN. OFFICER CATERINO, WHO
WAS THE CONTACT OFFICER EXITED THE MARKED PATROL UNIT
AND ADVISED THE DRIVER TO GET BACK INTO THE VEHICLE. THE
DRIVER COMPLIED AND AT THIS TIME WAS IDENTIFIED TO THESE
OFFICERS AS: . . . HAROLD WOLFORD . . . .

ALSO AT THIS TIME, LT. JAMES KNOTT ARRIVED ON SCENE TO
ASSIST THE OFFICERS. MR. WOLFORD WAS NOW BACK IN HIS
VEHICLE AND OFFICER CATERINO WAS OBTAINING INFORMATION
FROM WOLFORD, WHILE OFFICER LUKANSKI WAS ON THE
PASSENGER SIDE OF THE VEHICLE. AT THIS TIME, OFFICER
LUKANSKI OBSERVED A SILVER FIRE ARM ON THE FLOOR DIRECTLY
AT THE RIGHT SIDE OF MR. WOLFORD, WHICH WAS WELL WITHIN
THE REACH OF THE DRIVER. AT THIS TIME, OFFICER LUKANSKI
INFORMED OFFICER CATERINO OF THE SITUATION AND OFFICERS
REMOVED HAROLD WOLFORD FROM THE VEHICLE. WOLFORD WAS
PLACED IN HANDCUFFS AND DETAINED TO ENSURE THE SAFETY OF
ALL PARTIES INVOLVED. OFFICER LUKANSKI RECOVERED THE
FIREARM FROM THE VEHICLE, AND IDENTIFIED THE GUN AS A .25
AUTO STERLING WITH THE SERIAL NUMBER OF 016861. THE
WEAPON WAS LOADED WITH SIX ROUNDS IN THE MAGAZINE AND
ONE IN THE CHAMBERS. OFFICERS ASKED MR. WOLFORD IF HE WAS
THE REGISTERED OWNER OF THE FIREARM AND WOLFORD STATED.
"NO I BOUGHT IT OFF THE STREET." OFFICER CATERINO RAN THE
FIREARM THROUGH NCIC AND IT CAME BACK AS NO RECORD
FOUND. OFFICERS WERE ALSO INFORMED BY DISPATCH THAT MR.
WOLFORD WAS NOT LICENSED TO CARRY A FIREARM. WOLFORD
CONFIRMED THIS VERBALLY TO THE OFFICERS. AT THIS TIME,
OFFICER LUKANSKI INFORMED HAROLD WOLFORD THAT HE WAS
UNDER ARREST FOR POSSESSING A FIREARM WITHOUT A PERMIT.

OFFICER CATERINO AT THIS TIME ASKED HAROLD WOLFORD IF
THERE WERE ANY OTHER WEAPONS OR CONTRABAND INSIDE THE
VEHICLE, AND WOLFORD WOULD NOT REPLY. AFTER BEING ASKED
AGAIN, WOLFORD STATED THAT HE DID NOT BELIEVE THAT THERE
WAS ANY CONTRABAND IN THE VEHICLE. WHEN CATERINO ASKED
WOLFORD FOR CONSENT TO SEARCH THE VEHICLE, WOLFORD
REPLIED "I DON'T WANT YOU TO SEARCH MY VEHICLE, BUT I GUESS
YOU'RE GOING TO, SO GET YOUR SEARCH WARRANT.

OFFICERS LUKANSKI AND CATERINO TRANSPORTED HAROLD
WOLFORD TO THE BRADDOCK POLICE STATION, WHILE LT. KNOTT
REMAINED WITH THE VEHICLE, AWAITING THE ARRIVAL OF
ALLMOR TOWING. LT. KNOTT REMAINED WITH THE VEHICLE AT
THE SCENE AND AT ALLMOR UNTIL OFFICERS COULD GAIN A
SEARCH WARRANT.

AT THIS TIME, OFFICERS LUKANSKI AND CATERINO, DUE TO THE
FACT THAT HAROLD WOLFORD WAS CARRYING AN ILLEGAL
PURCHASED FIREARM WITHOUT A LICENSE, WAS IN A HIGH DRUG
TRAFFIC AREA, AND ADVISED OFFICERS TO OBTAIN A SEARCH
WARRANT, HAVE REASON TO BELIEVE THAT ADDITIONAL WEAPONS
OR OTHER CONTRABAND ARE LOCATED INSIDE THE VEHICLE
LISTED ABOVE. OFFICERS REQUEST THAT A SEARCH WARRANT BE
ISSUED FOR ALL AND ANY LOCATIONS BOTH INSIDE AND OUTSIDE
OF THE VAN IN SEARCH OF ADDITIONAL ILLEGAL WEAPONS OR
CONTRABAND.

The affidavit of probable cause did not include that Officer Caterino thought Mr. Wolford

was a drug dealer. Officer Caterino testified at the suppression hearing that this information was

not included in the affidavit because they thought they had enough information without it.

They did not search the conversion van at all until the search warrant was obtained. Upon

searching the van, Officer Caterino recovered from the center console a large clear baggie that

contained an off-white rock-like substance, which he recognized to be crack cocaine. He also

found empty baggies in the console. The console was covered, but not locked. Once Officer

Caterino opened the console, he could see the drugs right away. A scale was not recovered.

**II. Legal Analysis.**

**A. Whether the initial stop of Mr. Wolford's conversion van by Officers Lukanski and Caterino violated Mr. Wolford's rights under the Fourth Amendment.**

Mr. Wolford attacks the validity of the initial stop of his vehicle. "Any and all evidence

obtained as a result of the search and seizure of the blue GMC conversion van must be

suppressed for the reason that the stop of the vehicle was without probable cause/reasonable

suspicion to believe that a motor vehicle offense had been committed." Motion to Suppress

Evidence, p. 8, ¶ 23.

The Fourth Amendment is not a guarantee against all search and seizures, but rather, only

against unreasonable ones. As explained by the Third Circuit Court in U.S. v. Delfin-Colina, 464

F.3d 392 (3d Cir. 2006):

> The Fourth Amendment protects individuals "against unreasonable searches and
> seizures." A traffic stop is a "seizure" within the meaning of the Fourth
> Amendment, "even though the purpose of the stop is limited and the resulting
> detention quite brief." Because an ordinary traffic stop is analogous to an
> investigative detention, it has been historically reviewed under the investigatory
> detention framework first articulated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868,
> 20 L.Ed.2d 889 (1968).
>
> Under Terry and subsequent cases, "'an officer may, consistent with the Fourth
> Amendment, conduct a brief, investigatory stop when the officer has a reasonable,
> articulable suspicion that criminal activity is afoot.' " Reasonable, articulable
> suspicion is a "less demanding standard than probable cause and requires a
> showing considerably less than preponderance of the evidence," and only a
> "minimal level of objective justification" is necessary for a Terry stop.

Id. at 396 (citations omitted). In this circuit, the applicable standard for determining whether a

routine traffic stop has violated a defendant's rights under the Fourth Amendment is "the Terry

reasonable suspicion standard." Id. at 397.

Significantly:

> [t]hough reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the "specific, articulable facts" to justify a reasonable suspicion to believe that an individual has violated the traffic laws. And a reviewing court must consider whether the "rational interferences from those facts reasonably warrant [the] intrusion." Ultimately, our mandate is to weigh "the totality of the circumstances-the whole picture."

Id. (citations omitted). The totality of the circumstances includes the location, the history of crime in the area, the suspect's nervous behavior or evasiveness, and the officer's "commonsense judgments and inferences about human behavior." Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (citation omitted). Notably, "[i]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." United States v. Moorefield, 111 F.3d 10, 12 (3d Cir.1997) (citation omitted).

Here, Officer Caterino testified that he observed the conversion van Mr. Wolford was driving fail to make a complete stop at the stop sign located at the intersection of Sixth Street and Talbot Avenue, a violation of 75 Pa.C.S.A. § 3323. He further testified that Mr. Wolford failed to use a turn signal when he made the right turn from Sixth Street to Talbot Avenue, a violation of 75 Pa.C.S.A. § 3334. We find this testimony by Officer Caterino to be credible. As such, the Government has provided specific, articulable facts to justify a reasonable suspicion to believe that Mr. Wolford had violated the above-stated traffic laws by failing to make a complete stop before turning right onto Talbot Avenue and by making the right turn from Sixth Street onto Talbot Avenue without using a turn signal. Mr. Wolford's Fourth Amendment rights were not violated when his vehicle was stopped and his motion to suppress on this basis is denied.

**B. Whether Officer Caterino's command to Mr. Wolford to re-enter his vehicle once he had exited the conversion van constituted an unconstitutional seizure of Mr. Wolford.**

Defendant further argues that the act of Officer Caterino ordering Mr. Wolford back into his conversion van after he had exited it constituted an illegal search and seizure in violation of Mr. Wolford's Fourth Amendment rights. Motion to Suppress Evidence, p. 8, ¶ 24. In support of this position, Defendant cites to that part of the United States Supreme Court's opinion in Arizona v. Gant, 129 S.Ct. 1710 (2009) wherein the Court held:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or if it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

Id. at p. 21, ¶ 49. "It is respectfully submitted that in light of Gant, the holding of Moorefield has been undermined, and that the ordering of the Defendant back into his vehicle constitutes an unreasonable search and seizure." Id. at p. 22, ¶ 51. In United States v. Moorefield, 111 F.3d 10 (3d Cir. 1997), the court held that police may order an occupant of a lawfully stopped vehicle to remain in the vehicle. Id. at p. 13.

While the Third Circuit court has not specifically addressed this issue, several other appellate courts have relied on the United States Supreme Court's holding in Maryland v. Wilson, 519 U.S. 408 (1997) to conclude that a police officer requiring a passenger to return to a vehicle involved in a traffic stop after the passenger has voluntarily exited the vehicle does not constitute an illegal seizure of the passenger in violation of the Fourth Amendment. See U.S. v. Sanders, 510 F.3d 788 (8th Cir. 2007); U.S. v. Williams, 419 F.3d 1029 (9th Cir. 2005); Rogala v. District of Columbia, 161 F.3d 44, 53 (D.C. Cir. 1998). See also U.S. v. Blair, 2007 WL

11

4284718, * 2 (D. Neb.) (same). In Wilson, the Supreme Court held that a police officer could order a passenger out of a vehicle during a traffic stop without violating the passenger's Fourth Amendment rights; in so holding, the Court reasoned that the public interest, namely the danger to an officer, was of great concern whereas the intrusion on the passenger was minimal. Id. at 414-15.

The rationale of the appellate courts cited above, in reaching this decision, is that a police officer has the discretion to control a traffic stop as he or she deems necessary to ensure the safety of the officers and other individuals on the scene, and that this interest outweighs the individual's liberty interest to be free from arbitrary interference by law officers. Sanders; 510 F.3d at 790-91; Williams, 419 F.3d at 1033-34; Rogala, 161 F.3d at 53.

We find that the rationale underlying the above-listed decisions is equally applicable to our scenario where it was the driver (as opposed to the passenger) that had exited a validly stopped vehicle. The strong public interest in officer safety outweighs Mr. Wolford's liberty interest, especially since Mr. Wolford had not only exited his van upon being stopped, but was walking away from the police officers at the time he was told to return to his vehicle. As such, we find that Officer Caterino's order to Mr. Wolford that he get back into his van after he had exited it did not constitute an illegal seizure that violated Mr. Wolford's Fourth Amendment rights. Moreover, in so holding, we find, contrary to the Defendant's argument, that the United States Supreme Court's decision in Arizona v. Gant, *supra*., is irrelevant to the issue of whether the police officer's order to Mr. Wolford to re-enter his van violated Mr. Wolford's right under the Fourth Amendment.

12

Defendant's motion to suppress based upon Officer Caterino's order to Mr. Wolford to get back into his vehicle after Mr. Wolford had exited it constituting an illegal seizure which violated Mr. Wolford's rights under the Fourth Amendment is denied.

## C. Whether the continued detention of Mr. Wolford once the traffic stop concluded violated Defendant's rights.

Defendant further argues that "[t]here was no basis for an objective reasonable articulable suspicion on behalf of the police to believe that Mr. Wolford was engaged in any criminal activity beyond the alleged traffic violation(s)" and therefore, "the police unlawfully extended the duration of the traffic stop beyond the time necessary to cite Mr. Wolford for the alleged traffic infractions" and "[t]he evidence derived from the continued detention . . . must be suppressed." Defendant's Motion to Suppress, p. 27, ¶¶ 58-59.

Officer Caterino testified credibly at the suppression hearing that as he was talking to Mr. Wolford about his traffic violations, Officer Lukanski informed him that there was a gun on the floor of the van next to Mr. Wolford. Thereafter, for the safety of the officers and Mr. Wolford, Mr. Wolford was removed from the vehicle, handcuffed, and detained in the back of the police car for a short period of time while the officers ascertained whether the weapon Officer Lukanski saw on the floor on the defendant's van was registered to Mr. Wolford (which they could not determine) and whether Mr. Wolford possessed a permit to carry a weapon (which they determined from dispatch he did not). Under these facts, the police did not unlawfully extend the duration of the traffic stop in violation of Mr. Wolford's rights. His motion to suppress based upon this argument is denied.

### D. Whether the gun Officer Lukanski observed in and seized from Mr. Wolford's vehicle was lawfully seized absent a warrant?

Defendant argues Officer Lukanski violated Defendant's Fourth Amendment rights when

he seized the weapon from Mr. Wolford's van because the seizure of the gun was not done

pursuant to the plain view doctrine. Defendant's Motion to Suppress, p. 32. "The .25 caliber

Sterling Arms pistol recovered from the blue GMC conversion van must be suppressed because it

was seized as a result of an unreasonable search and seizure, particularly because the firearm was

not properly seized consistent with the plain view doctrine, and no other exception to the Fourth

Amendment warrant requirement was applicable. The .25 caliber Sterling Arms pistol and any

and all evidence that derived from this illegal search and seizure must be suppressed." Id. at p. 9,

¶ 26.

The Supreme Court's decision in Horton v. California, 496 U.S. 128, 110 S.Ct. 2301

(1990) provides a three-part test to determine whether a warrantless seizure of an object in plain

view is reasonable and therefore, constitutional. First, an arresting officer must not have violated

the "Fourth Amendment in arriving at the place from which the evidence could be plainly

viewed." Id. at 136. Second, the incriminating character of the evidence must be "immediately

apparent." Id. Third, not only must an arresting officer satisfy the first prong, the officer "must

have a lawful right of access to the object itself." Id. at 137. See also United States v. Yamba,

506 F.3d 251, 256 (3d Cir. 2007) (it is well established that "if, while lawfully engaged in an

activity in a particular place, police officers perceive a suspicious object, they may seize it

immediately" without a warrant.).

Officer Caterino testified that at the time Officer Lukanski saw the weapon on the floor

of the conversion next to where Mr. Wolford was seated, Officer Lukanski was located at the

14

passenger side of Mr. Wolford's vehicle. As such, Officer Lukanski was on a public street

during the course of a valid Terry stop. Officer Caterino further testified that Officer Lukanski

told Officer Caterino, as Officer Caterino was talking to Mr. Wolford about the traffic violations,

that he had seen a gun on the floor of the van located next to Mr. Wolford.[2] We find, based upon

this testimony, that the requirements of the Horton inquiry have been met; Officer Lukanski's

warrantless seizure of the firearm was reasonable and did not violate Mr. Wolford's

constitutional rights. Defendant's motion to suppress based upon this argument is denied.

**E. Whether statements made by Mr. Wolford to the police must be suppressed because he was not Mirandized before making the statements.**

Defendant also argues that at the time he was questioned by the police, he had been

removed from his van at gunpoint and handcuffed and therefore, all of his statements about the

firearm and the contents of the van must be suppressed because he was not Mirandized as

required prior to being questioned by the police officers. Defendant's Motion to Suppress, pp.

32-33.

As set forth above, the following relevant testimony was introduced at the suppression

hearing. Once Officer Caterino was informed by Officer Lukanski that he had seen a gun on the

floor of the van next to Mr. Wolford, Office Caterino drew his weapon, got Mr. Wolford out of

car at gunpoint, handcuffed him, and put him in back of the police car. Mr. Wolford did not

---

[2]The Supreme Court has stated: "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679, 100 S.Ct. 2406 (1980) (citations omitted). See also Brosius v. Warden, 278 F.3d 239, 246 n. 4 (3rd Cir 2002) ("[h]earsay may be considered in a suppression hearing in a federal court."); U.S. v. Heilman, 2010 WL 1583097, *24 n. 24 (3d Cir. April 21, 2010) (same); U.S. v. Williams, 574 F.Supp.2d 530, 536 n. 6. (W.D. Pa. 2008 ) (Gibson, J.) (same); Akins v. Stowitsky, 2006 WL 3717394, *7 (W.D. Pa.) (McLaughlin, J.) (same).

.

15

resist. As Officer Caterino was handcuffing Mr. Wolford, but prior to placing him in the police car, Officer Caterino explained to Mr. Wolford that he was not under arrest, but that he was being detained for safety reasons while they found out what was going on.

Officer Caterino then asked Mr. Wolford, while he was handcuffed, if he was the registered owner of the firearm. In response to the question, Mr. Wolford said "no, he had bought it off the street." Officer Caterino then placed Mr. Wolford in the police car.

After Mr. Wolford was handcuffed and placed in the police vehicle, Officer Caterino asked Mr. Wolford if he had any other weapons or contraband in the vehicle. Mr. Wolford said "no." Officer Caterino then said "then there's no reason not to let us search your van." Mr. Wolford would not give permission for the search. Instead, he told the officers something to the effect of "you're going to do it anyhow, but get a search warrant."

Under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444.

The Third Circuit court has addressed what is required for a person to be "in custody" for the purposes of Miranda. In United States v. Willaman, 437 F.3d 354 (3d Cir.), cert. denied, 547 U.S. 1208, 126 S.Ct. 2902 (2006), the court of appeals instructed that "[a] person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest'." Id. at 359 (citation omitted). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so'." Id. (citations omitted). The

16

Willaman court further explained:

> Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

Id. at 359-60 (citations omitted).

With respect to what constitutes interrogation warranting Miranda safeguards, the

Supreme Court has held:

> "Interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Rhode Island v. Innis, 446 U.S. 291, 300, 300-01,100 S.Ct. 1682 (1980) (footnotes omitted).

Upon review of the totality of the circumstances in this case, in particular that Mr.

Wolford had been made to leave his van at gunpoint and was being handcuffed at the time he

was questioned about the weapon, we find that Mr. Wolford was in custody for purposes of

Miranda at the time he was questioned by Officer Caterino about the weapon and asked if he had

any other weapons or contraband in the van. We further find that these questions constituted an

interrogation of Defendant by Officer Caterino. Therefore, Defendant's Motion to Suppress Mr.

Wolford's statements made in response to these questions is granted.

To the contrary, the police officer's request to Mr. Wolford for permission to search his

van was not an interrogation such that the police had to inform Mr. Wolford of his Miranda

17

rights prior to making the request. Therefore, Defendant's Motion to Suppress this statement by Mr. Wolford is denied.

**F. Whether the evidence obtained as a result of the execution of the search warrant on the Defendant's conversion van must be suppressed?**

Mr. Wolford also argues that all evidence obtained as a result of the execution of the search warrant on the conversion van must be suppressed because: (1) the search warrant was overbroad; (2) probable cause for the search warrant derived from his initial silence when asked if he had any weapons or contraband in the van, a right secured by the Fifth Amendment, and from his refusal to allow the police officers to search the van without a search warrant, a right secured by the Fourth Amendment; and (3) the search warrant derived from the illegal search and seizure of the Defendant and the van. Defendant's Motion to Suppress, pp. 10-11, ¶ 28. "With the evidence derived from the prior illegalities purged, there simply was no probable cause to justify the issuance of the warrant for the search of the blue GMC conversion van." Id.

The Fourth Amendment of the United States Constitution guarantees that the government may not search or seize an individual's property without a warrant based on probable cause. U.S. Const. Amend. IV. District courts reviewing the issuance of a search warrant must not make an independent probable cause determination but, rather, are "constrained to determine only whether the affidavit provided a sufficient basis for the decision the magistrate judge actually made." United States v. Jones, 994 F.2d 1051, 1057 (3d Cir.1993). The issuing authority's determination of probable cause should be affirmed if, after considering the totality of the circumstances, "there is a substantial basis for a fair probability that evidence will be found." United States v. Conley, 4 F.3d 1200, 1205 (3d. Cir.1993).

Further, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741 (1965). Direct evidence linking the crime to the place to be searched is not necessary when issuing a warrant, "[i]nstead, probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property." Jones, 994 F.2d at 1056 (citations omitted).

In reviewing the statements made in the affidavit of probable cause for the issuance of the search warrant for Defendant's van, assuming *arguendo* that we agree with the Defendant that it was improper for the police officers to include in the affidavit that: (1) Officer Caterino asked Mr. Wolford for consent to search the vehicle and Mr. Wolford replied "I don't want you to search my vehicle, but I guess you're going to, so get your search warrant;" and (2) when Officer Caterino asked Mr. Wolford if there were any other weapons or contraband inside the vehicle, Mr. Wolford at first did not reply, this determination does not automatically result in the search warrant being invalid. As explained by the Third Circuit court in United States v. Herrold, 962 F.2d 1131 (3d Cir. 1992): "'even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit'." Id. at 1138 (quoting United States v. Johnson, 690 F.2d 60 (3d Cir. 1982), cert. den'd, 459 U.S. 1214 (1983); citing United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987), United States v. Driver, 776 F.2d 807, 812 (9th Cir. 1985), United States v. Mankani, 738 F.2d 538, 545 (2d Cir. 1984), United States v. Gigli, 573 F. Supp. 1408, 1413 (W.D. Pa.

1983)). The Herrold court further noted that:

> [i]ndeed, in a slightly different context involving allegedly false statements in an application for a search warrant, the Supreme Court placed its imprimatur on this principle. In *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684-85, 57 L.Ed.2d 667 (1978), the Court stated "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause," the warrant will be deemed to have been properly issued.

Id. Therefore, the critical question is whether, if the above-disputed statements were removed from the affidavit of probable cause, did the affidavit provide a sufficient basis for the decision the magistrate judge actually made.

Reviewing the contents of the affidavit of probable cause, and not considering the above-disputed statements, the affidavit of probable cause contained the following information: (1) when Officers Caterino and Lukanski first saw the Defendant's conversion van, it was parked in the rear of 537 Talbot Avenue, which was know to the officers to be a high drug traffic area; (2) as they approached the van in their marked police car, the van pulled out, turned southbound onto Sixth Street, failed to stop at a clearly marked stop sign and failed to use its turn signal as it turned right onto Talbot Avenue; (3) once the police initiated the traffic stop, the Defendant got out of the van and started to walk away from it, only getting back into the van after Officer Caterino advised him to do so; (4) as Officer Caterino talked to Mr. Wolford about his traffic violations, Officer Lukanski observed a gun on the floor of the van next to Mr. Wolford's seat and within his reach; (5) the gun was found to be loaded with six rounds in the magazine and one in the chambers; and (6) the officers were informed by dispatch that Mr. Wolford did not have a license for the weapon. Based upon this information, we find that sufficient facts remained in the affidavit of probable cause to support a finding that probable cause existed to believe that there

20

were illegal drugs in the conversion van; the search warrant was not overbroad.[3]

Defendant's Motion to Suppress the evidence obtained as a result of the search warrant on the basis that the search warrant was overbroad in that it authorized a search for narcotics when no probable cause supported the inference that illegal narcotics would be found inside the van probable cause and that probable cause for the search warrant derived from his initial silence when asked if he had any weapons or contraband in the van, a right secured by the Fifth Amendment, and from his refusal to allow the police officers to search the van without a search warrant, a right secured by the Fourth Amendment, is denied.

Turning next to Defendant's argument that all evidence obtained as a result of the search of the van must be suppressed because the search warrant stemmed from the initial search and seizure of Mr. Wolford and his van, which were illegal for all the reasons set forth above, for all of the reasons set forth in this Opinion, we have concluded that there was neither an illegal search nor an illegal seizure of either Mr. Wolford or his van. Therefore, this argument fails and Defendant's Motion to Suppress the evidence found in the van on this basis is denied.

## G. Whether the evidence found in the Defendant's conversion van must be suppressed because the van was searched prior to the search warrant being obtained?

Finally, although not contained in the Defendant's original motion to suppress, at the suppression hearing the Defendant argued that the evidence found in the conversion van should be suppressed because the van was searched prior to the search warrant being issued. This argument is based on Mr. Sellmon's testimony that he saw one of the police officers come out of

_____

[3]Having so held, it is not necessary to address the Defendant's argument that no police officer executing the search warrant could have reasonably believed that there was sufficient indicia of probable cause in the warrant to undertake the search of the van for drugs, and we elect not to do so.

21

the driver's side of Mr. Wolford's conversion van, after Mr. Wolford was no longer in his van, but the police were still on the scene, and then, upon retrieving from the van a freezer baggie with something white in it, yell "We got it! We got it!"

As stated earlier, we find that Officer Caterino's testimony at the suppression hearing was more credible than Mr. Sellmon's testimony as to what occurred on March 18, 2005. Officer Caterino testified that the conversion van was not searched until the search warrant was obtained. Officer Caterino further testified that it was during this search that a large clear baggie that contained an off-white rock-like substance, which he recognized to be crack cocaine, and empty baggies were found in the console. Based upon this testimony, we find that the Defendant's conversion van was not searched by the police prior to the search warrant being obtained. Defendant's motion to suppress the evidence found in the conversion van on the basis that the van was searched prior to the search warrant being issued is denied.

## III. Conclusion.

Defendant's Wolford's "Motion[s] to Suppress Evidence Obtained as a Result of an Unlawful Search and Seizure with Citation of Authority" [Doc. ##82 and 105] are granted to the extent the Motions seek to suppress the Defendant's statements made in response to police inquiries as whether he had a permit for the weapon found in his conversion van and whether there were any other weapons or contraband in the van, and otherwise denied. An appropriate Order will follow.

October **26**, 2010

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior District Court Judge

22